FILED

2015 Apr-17  PM 04:30
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| MIMEDX GROUP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO.: 2:15-cv-00369-JHE |
| | ) | |
| NUTECH MEDICAL, INC., et al. | ) | |
| | ) | |
| Defendants. | ) | |

### NUTECH'S RULE 12(B)(6) MOTION TO DISMISS MIMEDX'S PATENT INFRINGREMENT CLAIMS FOR UNPATENABLE SUBJECT MATTER

Sasha G. Rao
(*pro hac vice application pending*)
Brandon H. Story
(*pro hac vice application pending*)
**MAYNARD COOPER & GALE, LLP**
275 Battery Street
Suite 1350
San Francisco, CA 94111
Telephone:  415.704.7433
Fax:  415.358.5650

Scott S. Brown
**MAYNARD COOPER & GALE, P.C.**
2400 Regions/Harbert Plaza
1901 Sixth Avenue North
Birmingham, AL 35203-2618
Telephone:  205.254.1000
Fax:  205.254.1999

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... ii

I.      INTRODUCTION ...................................................................................... 1

II.     THE PATENT ACT'S PATENTABILITY REQUIREMENT ............................. 1

        A.      Laws of Nature and Natural Phenomena Are Not Patent-Eligible ............ 3

III.    THE ASSERTED PATENTS CLAIM NATURAL PHENOMENA ..................... 4

        A.      The '687 Claims Are Directed to Processes for Permitting Visual
                Examination of Human Placental Tissue Grafts ........................................ 5

        B.      The '494 Claims Are Directed to Compositions of Human
                Placental Tissue Grafts ................................................................................ 5

IV.     MIMEDX'S PATENT INFRINGEMENT CLAIMS AGAINST NUTECH
        SHOULD BE DISMISSED ......................................................................... 7

        A.      The Rule 12(B)(6) Standard ...................................................................... 7

        B.      The Standard for Assessing a §101 Challenge in a Rule 12(B)(6)
                Motion ....................................................................................................... 8

        C.      Patent Cases Can Be Dismissed under Rule 12(B)(6) for Claiming
                Unpatentable Subject Matter ..................................................................... 8

        D.      The '687 Claims Are Directed to Natural Phenomena .............................. 9

                1.      Grafts of human placental tissue are conventional ......................... 9

                2.      Human placental tissue has two naturally distinguishable
                        sides ................................................................................................ 10

                3.      The "placing an asymmetric label" step is not novel ................... 10

        E.      The '494 Claims Are Directed To Natural Phenomena ............................ 12

                1.      Separating amnion and chorion layers is not an act of
                        invention .......................................................................................... 13

                2.      Cleaning or "substantially cleaning" placental tissue is a
                        conventional step ............................................................................. 13

                3.      Dehydrating or "heat dehydrating" is also a conventional
                        step ................................................................................................... 13

                4.      Laminating is a natural phenomenon ............................................. 14

V.      CONCLUSION ......................................................................................... 15

CERTIFICATE OF SERVICE ............................................................................. 17

# TABLE OF AUTHORITIES

**Cases**

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l,*
  134 S. Ct. 2347 (2014) ........................................................... 2, 3

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2008) ................................................................. 7

*Ass'n for Molecular Pathology v. Myriad Genetics, Inc.,*
  133 S. Ct. 2107 (2013) ..................................................... 3, 4, 13

*Bell Atlantic Corp. v. Twombly,*
  550 U.S. 544 (2007) ................................................................. 7

*Bilski v. Kappos,*
  561 U.S. 593 (2010) ................................................................. 2

*Bonner v. City of Prichard,*
  661 F.2d 1206 (11th Cir.1981) .................................................. 4

*Bryant v. Avado Brands, Inc.,*
  187 F.3d 1271 (11th Cir. 1999) .................................................. 7

*Cardpool, Inc. v. Plastic Jungle, Inc.,*
  2013 WL 245026 (N.D. Cal. Jan. 22, 2013) .................................. 9

*Cogent Med., Inc. v. Elsevier, Inc.,*
  2014 WL 4966326 (N.D. Cal. Sept. 30, 2014) ............................... 9

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n,*
  776 F.3d 1343 (Fed. Cir. 2014) .................................................. 8

*Funk Bros. Seed Co. v. Kalo Inoculant Co.,*
  333 U.S. 127 (1948) ......................................................... 2, 4, 15

*Genetic Techs Ltd. v. Lab Corp. of Am. Holdings*
  2014 WL 4379587 (D. Del. Sept. 3, 2014) .................................... 9

*Genetic Techs. Ltd. v. Bristol-Myers Squibb Co.,*
  2014 WL 5507637 (D. Del. Oct. 30, 2014) ......................... 7, 8, 9, 10

*Gottschalk v. Benson,*
  409 U.S. 63 (1972) ................................................................... 2

*Griffin v. Bertina,*
  285 F.3d 1029 (Fed. Cir. 2002) ................................................. 14

*Harrington Mfg. Co. v. White*
    475 F.2d 788 (5th Cir. 1973) ............................................................................ 4

*Hockerson-Halberstadt, Inc. v. Avia Group Int'l,*
    222 F.3d 951 (Fed. Cir. 2000)........................................................................... 7

*In re TLI Commc'ns LLC Patent Litig.,*
    2015 WL 627858 (E.D. Va. Feb. 6, 2015)........................................................ 9

*Internet Patents Corp. v. Gen. Auto. Ins. Servs.,*
    29 F. Supp. 3d 1264 (N.D. Cal. 2013) .............................................................. 9

*Mayer v. Belichick,*
    605 F.3d 223 (3d Cir. 2010).............................................................................. 7

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.,*
    132 S. Ct. 1289 (2012) ................................................................... 2, 3, 11, 12

*OIP Techs. v. Amazon.com, Inc.,*
    2012 WL 3985118 (N.D. Cal. Sept. 11, 2012) ................................................ 9

*Open Text S.A. v. Alfresco Software LTD,*
    2014 WL 4684429 (N.D. Cal. Sept. 19, 2014) ................................................ 9

*OpenTV, Inc. v. Apple, Inc.,*
    2015 WL 1535328 (N.D. Cal. Apr. 6, 2015) ............................................... 8, 9

*Phillips v. AWH Corp.*
    415 F.3d 1303 (Fed. Cir. 2005)................................................................ 4, 5, 11

*Priceplay.com, Inc. v. AOL Adver., Inc.,*
    2015 WL 1246781 (D. Del. Mar. 18, 2015) .................................................... 9

*Tuxis Techs., LLC v. Amazon.com, Inc.,*
    2015 WL 1387815 (D. Del. Mar. 25, 2015) .................................................... 9

*Ultramercial, Inc. v. Hulu, LLC,*
    722 F.3d 1335 (Fed. Cir. 2013),....................................................................... 8

*Ultramercial, Inc. v. Hulu, LLC,*
    772 F.3d 709 (Fed. Cir. 2014).......................................................................... 8

## **Statutes**

35 U.S.C. § 101 .............................................................................................. passim

## **Rules**

Fed. R. Civ. P. 12(b)(6)................................................................................... passim

## I.      INTRODUCTION

It is axiomatic that a valid patent must cover patentable subject matter. That is, the patent must disclose an invention that is novel and useful. 35 U.S.C. § 101. And, to be an invention, the patent must do more than restate the laws of nature or describe a natural phenomenon. This is black letter law.

Contrary to this well settled law, MiMedx's Complaint[1] asserts patents that claim as their "inventions" placental tissue grafts harvested from human beings. These patents fail the basic patent-eligibility requirements because (1) they are not novel and (2) they merely describe natural phenomena. First, the asserted patents concede that human placental tissue grafts have been used in surgeries for over 100 years before MiMedx filed for its patents. Second, conventional techniques of grafting and visually-examining placental tissue – also admitted in the patents as being performed for over 100 years – do not transform placental tissue into a patent-eligible invention. Indeed, the disclosed process of separating and laminating placental tissue does not transform the tissue or its natural properties at all.

In short, MiMedx's patents are invalid because they do not cover patentable subject matter and, thus, cannot support a claim of infringement. Therefore, this Court should dismiss MiMedx's patent infringement claims against NuTech under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## II.      THE PATENT ACT'S PATENTABILITY REQUIREMENT

The Patent Act's patentability or patent-eligibility requirement only allows patents for "any new and useful process, machine, manufacture, or composition of matter" as set forth in

---

[1] MiMedx's complaint also alleges other causes of action in addition to patent infringement, including false advertising.  These additional causes of action are not the subject of this motion to dismiss.

35 U.S.C. §101:

> Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title.

The Supreme Court recognized "an important implicit exception" in this provision that "'[l]aws of nature, natural phenomena and abstract ideas' are not patentable." *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1293 (2012) (citation omitted). These exceptions are "consistent with the notion that a patentable process must be 'new and useful.'" *Bilski v. Kappos*, 561 U.S. 593, 601-02 (2010). And "[t]he concepts covered by these exceptions are 'part of the storehouse of knowledge of all men … free to all men and reserved exclusively to none.'" *Id.* at 602 (alterations in original) (quoting *Funk Bros. Seed Co. v. Kalo Inoculant Co.*, 333 U.S. 127, 130 (1948)).

The rationale for disallowing the patenting of the laws of nature and natural phenomena is that "they are the basic tools of scientific and technological work" and "monopolization of those tools through the grant of a patent might tend to impede innovation more than it would tend to promote it." *Mayo*, 132 S. Ct. at 1293 (citation omitted). To strike the right balance between protecting the public's right of access to the basic tools of science and promoting innovation, *Mayo* held that: "to transform an unpatentable law of nature into a patent-eligible application of such a law, one must do more than simply state the law of nature while adding the words 'apply it.'" *Id.* at 1294 (citing *Gottschalk v. Benson*, 409 U.S. 63, 71-72 (1972)).

In *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014), the Supreme Court explained the *Mayo* two-step analysis for examining patent-eligibility. The first step is to "determine whether the claims at issue are directed to one of those patent-ineligible concepts [laws of nature, natural phenomena and abstract ideas]." *Id.* The second step is to ask "[w]hat

else is there in the claims before us?" *Id.* (alterations in original). The second-step is: "a search for an 'inventive concept' – i.e., an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Id.* (alterations in original).

### A.     Laws of Nature and Natural Phenomena Are Not Patent-Eligible

*Mayo* considered claims covering processes that helped doctors use thiopurine drugs to treat autoimmune diseases and determine the appropriate dosage level. *See Mayo*, 132 S. Ct. at 1294-95. The Court found the claims patent-ineligible because: "the steps in the claimed processes (apart from the natural laws themselves) involve well-understood, routine, conventional activity previously engaged in by researchers in the field. At the same time, upholding the patents would risk disproportionately tying up the use of the underlying natural laws, inhibiting their use in the making of further discoveries." *Id.* at 1294.

The Supreme Court has also considered the exception for laws of nature and natural phenomena in several other cases that are apposite here. In *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 133 S. Ct. 2107, 2111 (2013) ("*Myriad*"), the Supreme Court held that isolated-DNA was patent-ineligible. In addressing Myraid's argument that the process of isolating DNA transforms the naturally occurring DNA into a man-made molecule, the Supreme Court held that: "separating that gene from its surrounding genetic material is not an act of invention." *Id.* at 2117. Myriad obtained a patent directed to the breast cancer genes, having been the first company to locate and identify the genetic sequence of these genes in the human chromosomes after extensive effort. *See id.* at 2117-18. The Supreme Court found that "extensive effort alone is insufficient to satisfy the demands of § 101." *Id.* at 2118.

The *Myriad* decision rests upon long-standing Supreme Court precedent. *See id.* at 2117 (citing *Funk Bros.*, 333 U.S. at 128-130, 132). For example, in *Funk Bros.*, the Supreme Court

invalidated a composition patent to a mixture of naturally occurring strains of nitrogen-fixing bacteria for leguminous plants. *See Funk Bros.*, 333 U.S. at 132. The patentee had discovered strains in different species of nitrogen-fixing bacteria that did not inhibit each other, isolated and used them in mixed cultures so that seeds of different leguminous plants could be inoculated with the same mixture. *See id.*, 333 U.S. at 130. The Supreme Court noted that the patentee: "[did] not create a state of inhibition or of non-inhibition in the bacteria. Their qualities are the work of nature. Those qualities are of course not patentable. For patents cannot issue for the discovery of the phenomena of nature." *Id.* (citations omitted).

## III.   THE ASSERTED PATENTS CLAIM NATURAL PHENOMENA

MiMedx's asserted patents, U.S. Patent Nos. 8,597,687 and 8,709,494, share an identical disclosure because the '494 patent issued from a continuation application of the '687 patent.[2] Their claims – the numbered paragraphs at the end of the patent – define the metes and bounds of the inventions claimed by the MiMedx patents. In *Harrington Mfg. Co. v. White*, the Fifth Circuit explained that: "the claims of a patent establish, as would a deed an estate in land, the metes and bounds of the grant." 475 F.2d 788, 791 (5th Cir. 1973).[3] Similar to a land deed, claims tell the public what the patentee regards as the boundary of its exclusive rights. In *Phillips v. AWH Corp.*, the Federal Circuit held that: "It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." 415 F.3d 1303, 1312 (Fed. Cir. 2005) (citation omitted).

---

[2] All citations to the patent specification in this brief have been made to the columns and line numbers of the earlier issued '687 patent with the understanding that the identical citation can be found in the '494 patent, with slightly different column and line numbers.
[3] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

### A.   The '687 Claims Are Directed to Processes for Permitting Visual Examination of Human Placental Tissue Grafts

The '687 patent has seven claims. Claim 1 of the '687 patent is its only independent claim on which all of the remaining claims depend. Claim 1 reads:

> 1. A method for permitting direct, visual determination of the orientation of a placental tissue graft by user, wherein the placental tissue graft has a first side and a second side, said method comprising: placing an asymmetric label on a portion of at least one side of said tissue graft, which label visibly distinguishes one side from the other side, thereby permitting direct, visual determination of the orientation for application of said tissue graft; and ascertaining the orientation of the placental tissue graft by direct visual determination.

Dependent claims 2-4 are directed to different types of labels: "an embossment" (claim 2); "a raised or indented texture" (claim 3) and "a logo, a design, a name or text" (claim 4). Dependent claim 5 is directed to a tissue graft with "multiple tissue layers" (claim 5). Dependent claims 6 and 7 require the claimed label to visibly distinguish each side of the placental tissue graft: "a basement side" (claim 6) and "a stromal side" (claim 7).

### B.   The '494 Claims Are Directed to Compositions of Human Placental Tissue Grafts

The '494 patent, which shares the same disclosure as the '687 patent, has claims directed to compositions of matter. Of the 10 claims of the '494 patent, claims 1, 6 and 9 and 10 are independent. Claim 1 of the '494 patent states:

> A dehydrated, laminated tissue graft consisting essentially of one or more washed and/or substantially cleaned amnion layers and one or more washed and/or substantially cleaned chorion layers, wherein at least one of the amnion layers contains its fibroblast cell layer, and further wherein the amnion layer and the chorion layer are directly laminated to each other.

Claims 2-5 depend on claim 1. Claim 2 has the additional requirement that the claimed layers are "dehydrated together in a drying fixture." Claim 3 requires the amnion and chorion layers to be "treated with an antibiotic prior to lamination." Claim 4 requires the tissue graft to be "exposed to sterilizing conditions." Claim 5 requires "one amnion layer and one chorion layer."

The remaining claims, similar to claims 1-5 above, are simply directed to a naturally occurring human placental tissue. Independent claim 6 of the '494 patent simply requires "one or more amnion layers" and "one or more chorion layers" with a wherein clause describing conventional separation, cleaning, and processing steps to be performed on these layers:

> A dehydrated, laminated tissue graft, wherein the tissue graft consists essentially of one or more amnion layers and one or more chorion layers wherein each of the amnion and chorion layers:
> are separated from a placenta to provide separate layers of amnion and chorion, washed and substantially cleaned without removal of the fibroblast cell layer from the amnion layer, and
> are layered directly over each other and are laminated and heat dehydrated together to provide the dehydrated, laminated tissue graft.

Claims 7 and 8 depend on claim 6. Claim 7 requires "one amnion layer and one chorion layer." Claim 8 requires the amnion and chorion layers to be "chemically decontaminated." Claims 9 and 10 are similar to claim 1.

Independent claim 9 differs from claim 1 in requiring the amnion layer to retain its epithelial cellular layer:

> A dehydrated, laminated, placental tissue graft which is a laminate comprising two or more separated and washed layers which layers are selected from amnion and/or chorion wherein the layers are directly laminated to each other and at least one of said layers is an amnion layer which retains an epithelial cellular layer.

Independent claim 10 is very similar to claim 1, except that it uses the more open-ended "comprising" language instead of "consisting essentially of" found in claim 1:

> A dehydrated, laminated, placental tissue graft which is a laminate comprising two or more separated and washed layers which layers are selected from amnion and/or chorion wherein the layers are directly laminated to each other and at least one of said layers is an amnion layer which retains a fibroblast cellular layer.

## IV.   MIMEDX'S PATENT INFRINGEMENT CLAIMS AGAINST NUTECH SHOULD BE DISMISSED

### A.   The Rule 12(B)(6) Standard

Federal Rule of Civil Procedure 12(b)(6) authorizes dismissal of a complaint that fails to state a claim upon which relief can be granted. The Supreme Court has held that: "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2008) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (internal quotation marks omitted). The complaint must establish "more than a sheer possibility that a defendant has acted unlawfully." *Id.*; *see also Twombly*, 550 U.S. at 556. Ultimately, this inquiry is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. Although the court accepts all factual allegations as true on a motion to dismiss under Rule 12(b)(6), legal conclusions unsupported by factual allegations are not entitled to that assumption of truth and the Court need not accept as true "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *See Iqbal*, 556 U.S. at 678.

To decide this motion to dismiss, the Court must consider: (1) the complaint; (2) the exhibits attached to the complaint; (3) matters of public record; and (4) undisputably authentic documents if the plaintiff's claims are based on these documents. *See Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010). The court may also take judicial notice of relevant public documents and records, such as the file histories of the asserted patents. *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1280 (11th Cir. 1999); *Hockerson-Halberstadt, Inc. v. Avia Group Int'l*, 222 F.3d 951, 957 (Fed. Cir. 2000); *see also Genetic Techs. Ltd. v. Bristol-Myers Squibb Co.*, No. CV 12-394-LPS, 2014 WL 5507637, at *3 (D. Del. Oct. 30, 2014) ("*Bristol-Myers*").

**B.      The Standard for Assessing a §101 Challenge in a Rule 12(B)(6) Motion**

Although the standard of proof in a motion to dismiss under Fed. R. Civ. P. 12(b)(6) based on a § 101 patentability is the subject of some debate, that debate is of no consequence here. The asserted patents are invalid under either standard.

The higher standard, articulated by the District of Delaware, is that dismissal is appropriate if there exists clear and convincing evidence of patent ineligibility based on the only plausible reading of the patent. *See Bristol Myers*, 2014 WL 5507637, at *4 (discussing the "clear and convincing evidence" standard and the reasoning presented in *Ultramercial, Inc. v. Hulu, LLC*, 722 F.3d 1335, 1339 (Fed. Cir. 2013)), *cert. granted, judgment vacated sub nom. WildTangent, Inc. v. Ultramercial, LLC*, 134 S. Ct. 2870 (2014)). On the other hand, the Northern District of California has held that the standard for §101 challenges on motions to dismiss is no different than the standard set forth by the Supreme Court in *Iqbal* and *Twombly*. *See OpenTV, Inc. v. Apple, Inc.*, No. 14-CV-01622-HSG, 2015 WL 1535328, at *7 (N.D. Cal. Apr. 6, 2015). The *OpenTV* court relied heavily on Judge Mayer's concurrence in *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 717 (Fed. Cir. 2014), where Judge Mayer explained that, in the face of a challenge to patentability under § 101, the patentee should not benefit from any presumption of eligibility, which is the basis for the clear and convincing standard. *Id.* at 720-21.

**C.      Patent Cases Can Be Dismissed under Rule 12(B)(6) for Claiming Unpatentable Subject Matter**

Since the Supreme Court's recent precedents on §101, dismissals for patent-ineligible subject matter are increasingly common. The Federal Circuit has affirmed the grant of motions to dismiss for unpatentable subject matter. *See, e.g., Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 717 (Fed. Cir. 2014); *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1349 (Fed. Cir. 2014). Recent dismissals under §101 include infringement claims

8

based on patents claiming laws of nature or natural phenomena. For example, in *Bristol Myers*, Chief Judge Stark of the District of Delaware found certain claims of the asserted patent -- directed to methods for amplifying and analyzing correlations between different regions of a gene sequence -- unpatentable under §101 and dismissed plaintiff's complaint under Rule 12(b)(6). *See id.,* 2014 WL 5507637, at *8-*12. And, in *Genetic Techs. Ltd. v. Lab. Corp. of Am. Holdings*, No. CV 12-1736-LPS-CJB, 2014 WL 4379587, at *14 (D. Del. Sept. 3, 2014), a Magistrate Judge's Report and Recommendation recommended dismissal of an infringement action concerning a patent's method claim for analyzing the presence of certain genetic traits to predict athletic ability based on § 101 ineligibility. The District of Delaware has also dismissed other patent infringement cases for falling into the abstract idea exception to patentable subject matter of §101. *See, e.g., Tuxis Techs., LLC v. Amazon.com, Inc.*, No. CV 13-1771-RGA, 2015 WL 1387815, at *2 (D. Del. Mar. 25, 2015); *Priceplay.com, Inc. v. AOL Adver., Inc.*, No. CV 14-92-RGA, 2015 WL 1246781, at *3 (D. Del. Mar. 18, 2015).  Courts in other jurisdictions have also granted motions to dismiss based on §101 grounds.[4]

> **D.     The '687 Claims Are Directed to Natural Phenomena**

MiMedx's asserted claims, no matter how narrowly they are construed, are directed to naturally occurring human placental tissue and their conventional uses.

> **1.     Grafts of human placental tissue are conventional**

The claims of the '687 patent do not describe anything other than naturally occurring two-sided human placental tissue that has undergone the conventional step of being grafted. The

---

[4] *See, e.g.*, In re TLI Commc'ns LLC Patent Litig., No. 1:14md2534, 2015 WL 627858, at *26 (E.D. Va. Feb. 6, 2015); *OpenTV*, 2015 WL 1535328, at *7; *Cogent Med., Inc. v. Elsevier, Inc.*, 2014 WL 4966326, at *3 (N.D. Cal. Sept. 30, 2014); *Open Text S.A. v. Alfresco Software LTD*, 2014 WL 4684429, at *3 (N.D. Cal. Sept. 19, 2014); *Cardpool, Inc. v. Plastic Jungle, Inc.*, 2013 WL 245026, at *4 (N.D. Cal. Jan. 22, 2013); *Internet Patents Corp. v. Gen. Auto. Ins. Servs.*, 29 F. Supp. 3d 1264, 1268–70 (N.D. Cal. 2013); and, *OIP Techs. v. Amazon.com, Inc.*, 2012 WL 3985118, at *5 (N.D. Cal. Sept. 11, 2012).

"Background of the Invention" section of the patent specification admits that: "Human placental membrane (e.g. amniotic membrane or tissue) has been used for various types of reconstructive surgical procedures since the early 1900s." (D.I. 1-1 at col. 1, lines 25-33.)[5] The patent specification also incorporates by reference "in its entirety," U.S. Patent No. 6,152,142, to Tseng as providing "a detailed look at the history and procedure for harvesting and using 'live' amniotic tissue for surgical procedures." (D.I. 1-1 at col. 1, line 65 – col. 2, line 3.) *See Bristol Myers*, 2014 WL 5507637 at *3 ("A court may also take judicial notice of the prosecution histories, which are 'public records.'"). Tseng explains the conventional process of preparing grafts by mounting sheets of amniotic membranes to a nitrocellulose filter and cutting them up into different sizes. (Stroy Dec. Ex. A at col. 5, lines 27-33.)[6]

### 2.      Human placental tissue has two naturally distinguishable sides

The patent describes the two sides of the placental membrane: "a stromal side and an opposite, basement side." (D.I. 1-1 at col. 2, lines 57-61; Stroy Dec. Ex. A at col. 1, lines 22 – 28.) The patent explains that the stromal side and the basement side are naturally distinguishable: "The stromal side of the amniotic membrane is the 'tackier' of the two sides of the amniotic membrane. A sterile, cotton tipped applicator may be used to determine which side of the amniotic tissue is tackier and, hence, the stromal side." (D.I. 1-1 at col. 7, lines 51-55.)

### 3.      The "placing an asymmetric label" step is not novel

While the '687 patent describes processing steps and techniques for cleaning, cutting, and dehydrating human placental tissue, none of these steps are present in the '687 claims. The only step of '687 claim 1 requires "placing an asymmetric label on a portion of at least one side of said tissue graft, which label visibly distinguishes one side from the other side." A broad

---

[5] "D.I. __" refers to Docket Item __, previously filed in this case.
[6] "Stroy Dec. Ex. __" referes to Exhibit __ of the April 17, 2015 Declaration of Brandon H. Stroy, filed concurrently herewith.

interpretation of "placing an asymmetrical label" arguably is that the label placed on the tissue need not involve the addition of separate physical components, because dependent claim 2 claims an embossment as the label and dependent claim 3 claims a raised or indented texture. *See Phillips*, 415 F.3d at 1314 (describing the strong implication that the use of limiting language in connection with a term necessarily means that the use of the term by itself is broader: "[T]he claim in this case refers to 'steel baffles,' which strongly implies that the term 'baffles' does not inherently mean objects made of steel.").

This step, therefore, requires nothing a surgeon could not perform using a pen to mark directly on the tissue graft. This would allow a user to visually distinguish one side from the other without touching the graft. Indeed, in light of the patent's disclosure of research from 1972 that "showed that the orientation with stromal side down provided move consistent 'take'" (Stroy Dec. Ex. A at col. 2, lines 4-6), surgeons knew how to orient a placental tissue graft so as to be most effective for treating patients decades before the patent's filing. The inventor confirmed the same during prosecution of the '687 patent where, in a July 26, 2013 Response to an Office Action, he argued that the claims covered "a visual label, such as a written mark, … to permit a surgeon at the point of use to directly identify the different faces…." (Stroy Dec. Ex. B at 5.)

The claims of the '687 patent, just like those at issue in *Mayo*, simply set forth natural phenomena – namely, human placental tissue with two sides, where one side is distinguishable from the other side. *See Mayo*, 132 S.Ct. at 1296 (holding that the claims of the challenged patent were not patentable because they simply set forth a natural law). To the extent that the asymmetrical label step "is more than a drafting effort designed to monopolize the law of nature," it is not inventive because doctors using a pen can, and conventionally have for over a 100 years, performed that step when treating patients. *See id.* at 1297 ("If a law of nature is not

patentable, then neither is a process reciting a law of nature, unless that process has additional features that provide practical assurance that the process is more than a drafting effort designed to monopolize the law of nature itself."). This step, just like the steps in *Mayo*, "tells doctors to engage in well-understood routine, conventional activity previously engaged in by scientists in the field." *Id.* at 1298.

And, even taking all the words of the '687 claims together, what they state is "[p]urely 'conventional or obvious' '[pre]-solution actvity'" that is "normally not sufficient to transform an unpatentable law of nature into a patent-eligible application of such a law." *Id.* at 1298 (citations omitted). Therefore, the claimed methods of the '687 patent merely state natural laws and do not add anything significant to the natural laws other than merely stating conventional techniques that were well-known for decades to anyone using placental grafts.

### E.     The '494 Claims Are Directed To Natural Phenomena

The '494 claims, which are directed to compositions of matter, nevertheless, are also directed to natural phenomena because they claim compositions made entirely from naturally occurring placental tissue. Human placental tissue as admitted in the patent, naturally is a laminate of amnion layers including a fibroblast cell layer, and chorion layers:

> The placenta has two primary layers of tissue including amniotic membrane and chorion. The amniotic membrane is a non-vascular tissue that is the innermost layer of the placenta, and consists of a single layer, which is attached to a basement membrane. Histological evaluation indicates that the membrane layers of the amniotic membrane consist of epithelium cells, thin reticular fibers (basement membrane), a thick compact layer, and fibroblast layer. The fibrous layer of amnion (i.e., the basement membrane) contains cell anchoring collagen types IV, V, and VII. The chorion is also considered as part of the fetal membrane; however, the amniotic layer and chorion layer are separate and separable entities.

(D.I. 1-1 at col. 1, lines 35-48 (emphasis added).)[7]

---

[7] Because the '494 patent shares an identical specification to the '687 patent, references are made to the '687 patent specification for convenience.

1.     **Separating amnion and chorion layers is not an act of invention**

As explained above, the patent admits that: "The placenta has two primary layers of tissue including amniotic membrane and chorion." (D.I. 1-1 at col. 1, lines 35-48; Stroy Dec. Ex. A at col. 1, lines 35-38.) The patent also describes separating the amnion from the chorion: "After the placenta is obtained and cleaned, the amnion is separated from the chorion by blunt dissection…" (Stroy Dec. Ex. A at col. 2, lines 51-52.) Just as "separating [an important and useful] gene from its surrounding genetic material is not an act of invention," so too separating the aminon and chorion layers of human placental tissue from its surrounding material is not an act of invention. *Myriad*, 133 S.Ct. at 2117.

2.     **Cleaning or "substantially cleaning" placental tissue is a conventional step**

The patent specification, also admits that the (1) cleaning; (2) separating of amnion and chorion layers and (3) preparing grafts was conventionally known: "After the placenta is obtained and [1]<u>cleaned</u>, [2]the <u>amnion is separated from the chorion by blunt dissection</u>, [3] <u>flattened into filter paper</u> with the epithelium surface facing away from the paper, and<u> cut into small sheets.</u>" (D.I. 1-1 at col. 2, lines 51-55 (emphasis added)). Cut and filter mounted tissue is another way to describe a graft. (Stroy Dec. Ex. A at col. 5, lines 27-33.) The patent also admits many conventional techniques for washing and cleaning of placental tissue for surgical use in a section titled "Previous Method of Preparation and Preservation." (Stroy Dec. Ex. A at col. 2, lines 17-36.) To the extent that cleaned or "substantially cleaned" placental tissue is a meaningful requirement of the '494 claims, it is a conventional step.

3.     **Dehydrating or "heat dehydrating" is also a conventional step**

The patent specification also admits that drying or dehydrating placental tissue was conventionally done: "Typically, such membrane is either frozen or dried for preservation and

storage until needed for surgery." (D.I. 1-1 at col. 1, lines 31-33; *see also*, D.I. 1-1 at col. 1, lines 55-58.) The patent specification also admits that drying of the amniotic membrane in an oven prior to use was known. (Stroy Dec. Ex. A at col. 2, lines 27-29.) Therefore, to the extent that dehydrated placental tissue is a meaningful requirement of the '494 claims, conventionally produced placental grafts were also dehydrated.

### 4.     Laminating is a natural phenomenon

The last clause of '494 claim 1 states that "wherein at least one of the amnion layers contains its fibroblast cell layer, and further wherein the amnion layer and the chorion layer are directly laminated to each other." The patentee views this limitation as essential to the alleged invention of the '494 patent.[8] Indeed, by the patentees' own admission in the prosecution history of the patent, the claims of the '494 patent are distinguishable from the prior art because the claimed amnion layer "comprises a fibroblast cell layer, i.e., a fibroblast cell layer that is not removed." (Stroy Dec. Ex. C at 6.) But amnion layers in which fibroblast cells have not been removed are not novel. That is the amnion layer's natural state in the human body. And, to the extent that laminating the naturally occurring layers is considered a meaningful limitation, naturally occurring placental tissue already exists as a laminate in nature. (D.I. 1-1 at col. 1, lines 39-47 (emphasis added); Stroy Dec. Ex. A at col. 3, lines 49-64.)

Separating, dehydrating and laminating placental tissue does not transform it into a man-made composition of matter because it does not change the natural properties of the layers of tissue that nature had already created and arranged as a laminate. At best, MiMedx merely "discovered" that the layers of amnion and chorion continue to have their natural qualities of healing, even when they are separated, dehydrated or laminated. As such, the '494 patent wholly

---

[8] *See Griffin v. Bertina*, 285 F.3d 1029, 1033-34 (Fed. Cir. 2002) (finding that "wherein" clauses limited a process claim where they "relate[d] back to and clarif[ied] what is required by the count" and gave "meaning and purpose to the manipulative steps").

falls within the ambit of the *Funk Bros.* decision. Specifically, just as the "aggregation of select strains of the several [bacteria] species into one product" is not patentable but rather is the mere "application of [a] newly-discovered natural principle," the '494 patent's combination of natural occurring placental layers is nothing more than the "discovery of some of the handiwork of nature and hence is not patentable." *Id.* at 131. Each layer in the claimed composition of the '494 patent behaves in the same way as it does in nature – the claimed combination produces no new materials. Each layer of the claimed composition "has the same effect that it always had. The [layers] perform in their natural way. Their use in combination does not improve in any way their natural functioning. They serve the ends nature originally provided and act quite independently of any effort of the patentee." *Id*.

## V.    CONCLUSION

It would be futile for the Court and the parties to spend resources litigating the merits of patents that are plainly written in violation of §101. The admissions in MiMedx's patents regarding naturally occurring placental tissue and conventional techniques pertaining to their use, combined with the Supreme Court authorities warrant a dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

Respectfully submitted by,

/s/ *Scott S. Brown* _____
Scott S. Brown
**MAYNARD COOPER & GALE, P.C.**
2400 Regions/Harbert Plaza
1901 Sixth Avenue North
Birmingham, AL 35203-2618
Telephone: 205.254.1000
Fax: 205.254.1999

OF COUNSEL:

Sasha G. Rao
(*pro hac vice application pending*)
Brandon H. Story
(*pro hac vice application pending*)
**MAYNARD COOPER & GALE, LLP**
275 Battery Street
Suite 1350
San Francisco, CA 94111
Telephone: 415.704.7433
Fax: 415.358.5650

## CERTIFICATE OF SERVICE

I hereby certify that on 17 April 2015, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system and served by U.S. Mail, postage prepaid:

M. Christian King
Audrey Elaine Brown
**LIGHTFOOT FRANKLIN & WHITE, LLC**
400 20th Street North
Birmingham, AL  35203
Telephone:  205.949-6387
Fax:  205.581-0799

Deepro R. Mukerjee
(*pro hac vice*)
Leah W. Feinman
(*pro hac vice*)
Poopak Banky
(*pro hac vice*)
Wesley C. Achey
(*pro hac vice*)
**ALSTON & BIRD LLP**
90 Park Avenue
New York, NY  10016
Telephone:  212.210.9400
Fax:  212.210.9444

Attorneys for Plaintiff
MiMedx Group, Inc.

Joel M. Kuehnert
J. Thomas Richie
**BRADLEY ARANT BOULT CUMMINGS LLP**
One Federal Place
1819 Fifth Avenue North
Birmingham, AL 35203
Telephone: 205.251.8000
Fax: 205.251-8800

Attorneys for
DCI Donor Services, Inc.

s/ *Scott S. Brown*
Of Counsel